CALKINS v. LICHTIG.

In re SCHLEGEL.

(Circuit Court of Appeals, Sixth Circuit.    June 29, 1918.)

No. 3128.

1. BANKRUPTCY ⨺180—CHATTEL MORTGAGE—RIGHTS OF SUBSEQUENT CRED-
ITORS—FRAUD.
    On the issue of a bankrupt's chattel mortgage in fraud of subsequent
creditors, it is not the acts which apparently show good faith that pre-
vail, but the acts which show bad faith, as fraud taints every transaction
into which it enters.

2. CHATTEL MORTGAGES ⨺185—RECORD—EFFECT.
    The filing of a chattel mortgage is only a substitute for the possession,
which otherwise must accompany the delivery of a pledge.

3. BANKRUPTCY ⨺178(1)—CHATTEL MORTGAGE—FRAUD.
    The filing of a chattel mortgage was not a protection against a secret
fraud, in part consummation of which the bankrupt's mortgage, though
valid on its face, was given.

4. BANKRUPTCY ⨺180—CHATTEL MORTGAGE—FRAUD ON SUBSEQUENT CRED-
ITORS—EVIDENCE.
    A chattel mortgage given by a bankrupt to a former partner, covering
stock and other assets on hand and subsequently acquired property, held
to have been made in furtherance of a scheme for the mortgagee's bene-
fit, and in fraud of the mortgagor's subsequent creditors.

Appeal from the District Court of the United States for the North-
ern Division of the Eastern District of Michigan; Arthur J. Tuttle,
Judge.

In the matter of the bankruptcy of Irwin R. Schlegel. From a
decree sustaining the objection of David B. Lichtig, trustee in bank-
ruptcy, to the bankrupt's chattel mortgage, because made in fraud
of his subsequent creditors, the mortgagee, Charles W. Calkins, ap-
peals. Affirmed.

The only question on this appeal is raised by the claim of the trustee in
bankruptcy that a chattel mortgage given August 24, 1914, by Schlegel, the
bankrupt, to Calkins, his uncle, the appellant, with whom he had been in
partnership in general merchandising at Farwell, Mich., covering stock and
other assets on hand and subsequently acquired property, was made in further-
ance of a scheme for Calkins' benefit, to defraud Schlegel's subsequent credi-
tors.

Calkins, engaged in a number of enterprises and conversant with the value
of stocks of general merchandise, had some means. Schlegel had none. Prior
to June, 1912, they had been in business together for a year and a fraction
under the name Calkins-Schlegel Mercantile Company, at Lansing, Mich.,
whence, after unprofitable business and a fire, followed by a fire sale of the
stock, they moved the unsold salvage to Farwell, a village of about 600 people,
and carried on business there under that name for about 26 months. Calkins
lived at Clare, 5 miles away. Such stock as from time to time was added was
paid for by Calkins, if the money was not on hand at the store. Goods were
ordered, sometimes by one and sometimes by the other. Schlegel had no
salary, no interest in the stock, and no agreed share in profits, but took money
out of the till as he or his wife wanted it, without making any memorandum
in writing. No books were kept, excepting a cash book, in which was a record
also of the money Calkins said he put in. The invoices, as they came in,
were paid from time to time. The cash book was not forthcoming at the

⨺For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

trial. Concerning it Schlegel said, "He [Calkins] either took them, or I destroyed them, or something."

The business was not profitable, and on August 24, 1914, Calkins sold the assets to Schlegel, who on that date gave his note to Calkins for $10,522.08, payable $50 down, $50 one week from date, and $50 on Monday of each week thereafter until the note was paid, with 7 per cent. interest. No other sum than the $50 in cash was ever paid. The consideration was the amount Calkins said he had put in, and was made up from a memorandum said by him to be a copy of a sheet from a ledger which, at the first meeting of creditors, he said was in his possession. At the hearing before the referee he said he had lost the original after the copy was made. His explanation of why he had no check stubs or returned checks was that he had burned them, as he had no use for checks older than a year. He testified July 20, 1915.

To secure the note Schlegel executed a chattel mortgage covering the entire stock, furniture, fixtures, book accounts, notes, and mortgages running to the Mercantile Company, as well as such of these choses as might be taken by Schlegel in the future, present and future goods in transit, and all after-acquired stock and goods, "it being the intention of the parties hereto that this mortgage shall be a continuing security upon such stock of goods as fast as put into such store," and giving power to the mortgagee to take possession on certain contingencies, as well as requiring insurance in his favor. The mortgage was filed with the township clerk at Farwell, who was a physician having his official and professional office in the same room in his residence, two blocks out of town; and notice, which contained no affidavit, was also filed that the business formerly conducted under the name Calkins-Schlegel Mercantile Company was on that day dissolved by mutual consent and would be conducted by Schlegel. About a week afterwards the sign at the store and the stationery were changed to show that Schlegel was the successor of the Mercantile Company.

Preliminary to the sale an inventory was taken by Calkins and Schlegel, values fixed at cost, without depreciation of any kind, showing assets: Stock, $8,918.83; fixtures, $1,644.62; notes receivable, $135.92; book accounts $129.50—total, $10,923.87. Calkins admits that the values fixed were high, and that if the business had been closed out at that time it would not have brought over $7,000 to $8,000. The reason given by Calkins for the dissolution was that Schlegel was "a little bit heavy on the buy," that salesmen would come in and sell him goods Calkins thought were not needed, and that just before the dissolution Schlegel wanted Calkins to furnish him money with which to buy hogs, which Calkins declined to do, apparently because Schlegel did not intend to purchase them on partnership account. It does not otherwise appear that up to that time Schlegel had bought goods improvidently or extravagantly. On paper Schlegel's equity was about $300, but the property was worth much less than the inventory value. Assuming that he really owed Calkins the amount of the note, he was insolvent, and both he and Calkins knew it.

Calkins had kept the credit of the business good. At the time of the sale the firm owed nearly $1,400, which after the sale Calkins furnished to Schlegel, who in September and October paid out all of the creditors of the old firm. So Schlegel started in business on his own account with excellent credit. . Immediately he began buying large amounts of merchandise on credit. In September, October, and November his purchases aggregated about $11,000 in value. Calkins looked in occasionally and knew of the receipt of these goods. He knew, also, that business was not good. In December he took a trip to California. Before going, Schlegel said to him, "I have got the stock, and you need not worry." Whether or not he was accustomed to go away in the winter does not appear. He returned about April 1, 1915, and found the store, as he described it "so darned packed full of goods you couldn't walk through." From August 24, 1914, to April 19, 1915, Schlegel had bought on credit $19,789.55 worth of goods, for which he had paid only $2,706.83, and the schedule in bankruptcy showed stock in trade (including fixtures, returned by him at $517.50) of a value of $17,657.55.

In the meantime no demand was made by Calkins for the weekly payments

of $50 each, nor any demand whatever until in March, when, Calkins says, he wrote to his attorney to see if he could get any money out of Schlegel— "some money I could use out there." While away Calkins corresponded with his nephew "about general topics of the country," and in one letter only asked him about business, and learned that "it was absolutely rotten." An involuntary petition in bankruptcy was filed May 10, 1918.

Calkins testified to a need for money during the months prior to December, and that he sold farmers' notes held by him to Schlegel at 5 per cent. |discount. Whether or not these notes, if there were any, were paid by their makers to Schlegel, does not appear. The auditor found payments to Calkins from August 24, 1914, to December 7, 1914, of $923.90, made up, it is claimed by Calkins and Schlegel of moneys paid for notes, $100 on the sale of tinner's tools left with Schlegel by Calkins for sale, and of which there is no record, and $300 to Calkins on account of the purchase of a house owned by Calkins and occupied by Schlegel and his wife, the deed to which was taken in the wife's name.

Schlegel says he notified creditors of the old firm of the dissolution and the assumption of the business by him. Perhaps he did; but, as they had been paid, his credit with them would be good. Some, however, wanted a statement before extending credit. To the Pittsburgh Steel Company (debt scheduled at $1,099.63) he wrote October 7, 1914: "In regard to us making you a statement, we deem it not necessary, as our Mr. Schlegel purchased the Calkins interest of the Calkins-Schlegel Merc. Co., and we paid every cent we owed in full to date, leaving Mr. Schlegel sole proprietor of the $14,000 stock. It seems very queer that you are holding up the order for these goods; we want this month, as our storeroom is ready to receive them now; and the fence we have for sale every day. If in doubt of, as to our credit, we give you a few of the best concerns in the country as references. Some may not, as they will be losing the business that you are to receive."

To Baldwin Stove Company, of Cleveland, he wrote similarly October 15, 1914.

To Butler Bros., Chicago, he wrote October 12th: "Please find inclosed order for I. R. Schlegel, who has assumed the Calkins interest of the Calkins-Schlegel Merc. Co. We paid every dollar that we owed in full."

These concerns made sales to Schlegel, presumably on the strength of these letters and the credit of the old firm; but to Myer, Wise & Kaichen Company, of Cincinnati, with whom apparently the firm had not dealt, he wrote in 1914, the month not appearing: "Below I hand you a full and correct statement of my affairs, for the purpose of establishing a credit with you." He showed cash value of merchandise, $14,000; total assets, $17,700; total liabilities, $3,700; net worth, $14,000—and said: "About September 1st I. R. Schlegel purchased the Calkins interest of the Calkins-Schlegel Merc. Co. We paid every dollar we owed up at that time and as fast as it comes due. We do not see why you hold goods upon us, as we can buy goods by the carload. We are financially better off than ever before. Kindly consign these goods rush to I. R. Schlegel, Farwell, Mich., Successor to Calkins-Schlegel Merc. Co."

Not a word in these letters about the mortgage. The statement of the value of the assets was grossly misleading, and the item of total liabilities was deliberately untrue. When pressed on cross-examination, Schlegel said he did not understand making out statements, and that the statement to the concern last named was made, he said at one time, by a young woman clerk, and at another time by his wife, who sometimes came to the store. He said there might be other letters telling about the mortgage, and that "a mortgage, as long as it is filed, is news to them." No other letters were produced.

He says he told salesmen of all of his creditors that his equity amounted to about $300, but only when their salesmen asked him about it, of whom "lots" did. Under pressure of cross-examination he mentioned several of such salesmen; but his testimony, sometimes contradictory, sometimes reckless, and at all times highly unsatisfactory, leaves the impression of want of reliability. He may have told some salesmen; but, if he did, it was only when they asked him about it, and it was in pursuance of Calkins' instructions to him.

Calkins, when asked if he knew of Schlegel's representations to the Pittsburgh Steel Company and Butler Bros., said: "No, it was none of my business. I told him to buy the stuff right, and not to lie to anybody. * * * If they ask about this mortgage, tell them the exact financial condition. There is no use lying to anybody." Calkins himself did not notify the concerns from which the partnership had bought goods that he had withdrawn, because he said he did not think it necessary, when they were all paid up. He did not notify the mercantile agencies. He told of the mortgage only when salesmen of business houses asked him, and did not at any time tell them what Schlegel's financial condition was. There was but one creditor to whom he said he had volunteered information that he had a mortgage.

Schlegel at the date of the sale was about 27 years of age and had had considerable experience in the kind of business in which he was engaged, but in explanation of his extraordinary purchases on credit he says that he was overpursuaded by salesmen to purchase from them, and he gives four instances. From one he bought a carload of roofing; from another a carload of mattresses; from another a carload of fencing, wire, and nails, and flour from another; all staple commodities, subject to little, if any, depreciation, and for which there was always a sale. His letter to Pittsburgh Steel Company shows that the reason he gives for overstocking with fencing was false, though the statement to Myer, Wise & Kaichen that he could buy goods by the carload was true.

In endeavoring to account for assets the auditor found should have been on hand when his creditors closed in on him, Schlegel said he spent $300 or $400 in September on horse racing at Detroit, and that his store was robbed of about $300 worth of goods in the same month.

It is not charged that Schlegel actually secreted any money or goods, but it plainly appears that the firm had conducted a losing business; that business was bad from the time he started in on his own account, and he stocked his store with goods on credit in large quantities, knowing that he could not pay for them out of receipts from sales in the ordinary course of trade in the limited field in which he operated.

On the facts the District Court, as had also the referee, sustained the claim of the trustee and set the mortgage aside. Calkins appealed.

E. L. Beach, of Saginaw, Mich., and Clyde I. Webster, of Detroit, Mich., for appellant.

Kinnane & Lane, of Bay City, Mich. (Selling & Brand, of Detroit, Mich., of counsel), for appellee Lichtig.

Before KNAPPEN, Circuit Judge, and HOLLISTER, District Judge.

HOLLISTER, District Judge (after stating the facts as above). [1] In view of the facts and the reasonable inferences to be drawn from them, it is idle to urge that a chattel mortgage of after-acquired property is good in Michigan, that one partner may sell his interest in the partnership to another partner, that filing the mortgage was technical notice to the world of its existence, or, in the absence of further information than the record discloses, that the consideration for the mortgage was valuable, and that there were many evidences of good faith in the transaction, such as filing the mortgage and notice of dissolution, and changing the name on the sign and on the stationery; for these, though correct statements of the law and important facts tending to show good faith, do not tell the whole story, and when all the facts are considered, must fail to accomplish the fraudulent purpose their appearance of good faith was designed to cover. In such a case as this, it is not the acts which apparently

show good faith that prevail, but the acts which show the want of it; for fraud taints every transaction into which it enters, and the law protects subsequent creditors against actual fraud on them. Bump on Fraud. Con. (4th Ed.) §§ 290, 291.

In dealing with rules of law and with circumstances tending to show good faith under cover of which a fraud was perpetrated, it was said by Judge Hook in Amundson v. Folsom, 219 Fed. 122, 125, 135 C. C. A. 24, 27:

"But all such things, especially when in close consecutive association, are to be considered, with what else appears, in determining whether the result was the consummation of a preconceived purpose to hinder, delay, or defraud creditors. * * * Transactions apparently innocent when separately regarded may take on a different signification when seen in their true connection with others. And it is not always safe to venture a prohibited course on a mosaic of sound, but unrelated, rules of law."

[2, 3] While Calkins and Schlegel would have it believed that Schlegel's want of power of resistance to the overpersuasive insistence of salesmen was the cause of his extraordinary purchases, yet he had been in the same kind of business for several years, and the record shows he was by no means inexperienced or unsophisticated. On the contrary, there is much evidence of appreciation on his part of the ways of business and the probable effect of concealing from those with whom he was dealing matters of such importance that, had they been known, creditors would not have fallen into the trap set for them. One of the strongest evidences of his full understanding of what he was about was his expressed opinion that specific notice to creditors of the filing of the mortgage was not necessary because the filing itself would be notice to them. He appreciated that filing the mortgage was a conspicuous badge of good faith, and had a keen sense of its legal effect.

Filing a mortgage is, however, only a substitute for the possession which otherwise must accompany the delivery of a pledge. It is not even a protection in cases in which the mortgage contains fraudulent stipulations. Robinson v. Elliott, 22 Wall. 513, 521, 22 L. Ed. 758. Much less is it a protection against a fraud conceived in secret, in part consummation of which the mortgage, though valid on its face, is given.

[4] Assuming, for the purposes of the issue now before us, that all concerns with whom the old firm had dealt, and all with whom Schlegel had dealings on his own account, knew in contemplation of law of the mortgage and of the dissolution of the partnership, yet they had no notice that he had no real interest in the stock of goods and was hopelessly insolvent when the mortgage was given.

Calkins was careful to keep the credit of the old concern unimpaired, and, by furnishing Schlegel with the money to pay its creditors, as if coming from Schlegel himself, imparted a further credit to Schlegel to which he was not entitled. This was enough to cause those who had dealt with the old concern to believe on reasonable grounds that they could safely deal with one of the partners who had succeeded to the business.

Calkins knew what the effect on the trade would be when he kept the partnership credit good and started his nephew out with a reputation for paying his debts. He knew, also, whatever legal implications might be drawn from filing the mortgage, that in fact few, if any, creditors would probably know of it. Knowing this, he did not notify any commercial agency or the concerns with whom the partnership had been dealing of his withdrawal from the firm and of his protection through the chattel mortgage, nor did he tell any of them of the fact, unless he was directly questioned by salesmen, and even then he did not tell them of his nephew's insolvency, nor advise any of them that he was receiving money from his nephew for the purposes, or any of them, shown by the facts. Even on the assumption that the stock, fixtures, etc., were worth as much as they were inventoried, he nevertheless immediately caused the assets to be depleted by about the same sum Schlegel's equity appeared to be worth. In fact, however, he did this with the knowledge that the inventoried values were far in excess of the actual values of the property. In the item of fixtures alone there was an overvaluation of $1,126.

When Calkins saw that, within three months after he had withdrawn, his nephew had in the store as much as $11,000 worth of goods bought on credit, and had been assured that he need not worry, because the stock was there, he went to California for the winter, his mind easy in the comfortable belief that the loss he had incurred while in a losing business with his nephew would be made good through the scheme his nephew was carrying out, so admirably safeguarded, as it was, by appearances of fair dealing and rules of law established to protect those who act in good faith.

One wonders what thought consistent with honest purpose prompted the injunction to Schlegel not to lie if any one asked him about the mortgage. What Calkins in effect said was: "Do not voluntarily tell anything about it; but, if any one asks, don't lie." Evidently Calkins resolved to tell the truth himself about the mortgage, if any one inquired; but he does not say that he ever told anybody that Schlegel was insolvent. If Schlegel told "lots" of salesmen that his equity was worth about $300, the statement was false in itself. That he informed any salesmen of his insolvency is not believable, for the reason, among others, that no salesman, however limited his authority, would sell his employer's goods on such a slender factor of safety.

Explanation of the policy of truth-telling is found in the danger to be apprehended from discovered falsehood; but that policy did not go so far as to include the whole truth, and stopped at those half-truths which answer the purpose of falsehoods.

Schlegel's conduct, from whatever standpoint it may be viewed, does not give the impression of good faith. One would expect a young man of the proper sort, just starting out in business for himself, with good credit and in debt more than the value of his goods, would be jealous of every expenditure and cautious in contracting debts, and particularly careful about his personal conduct. The purchase of more than $19,000 in stock on credit for a business in a town

of 600 people, and which had been a losing enterprise from the beginning, is, under the circumstances, evidence of intentional fraud.

In a highly optimistic mind there could be no hope, in the limited field in which Schlegel operated, of disposing within a reasonable time of the large amount of goods he was buying before the persons whom he owed for them would close in on him. He knew the field, and was conscious that, if he and Calkins had made no money in it, he could not dispose of the goods he had bought in time to pay for them on reasonable terms of credit. When he went into bankruptcy in May, he had on hand in merchandise considerably upwards of $17,-000, and was owing nearly that sum to unsecured creditors. In the absence of any evidences of extravagant purchases by Schlegel prior to his going into business on his own account, the conclusion is irresistible that the reason given by Calkins for terminating the partnership, that Schlegel was "a little bit heavy on the buy," had no existence in fact, and affords a not even' plausible explanation of Schlegel's extraordinary purchases on credit.

Assuming that Calkins discounted farmers' notes with Schlegel, how is it that Calkins, needing money, was dealing in this way with him, without asking for the weekly payments promised in the note?

From all the circumstances it fairly appears that Calkins, realizing that the business was unsuccessful and that the future held out no hope for it, had an understanding with Schlegel involving the sale and mortgage, the payment of the debts of the firm (for which he was liable in any event) in Schlegel's name as a basis of credit, and the purchase by Schlegel of large quantities of goods on credit, which would make Calkins good at the expense of Schlegel's creditors when the crash came. What was done amounted to intentional fraud on those creditors, participated in by both parties.

In Michigan it is enough that such fraud be established by a preponderance of the evidence. Dorrington v. Carpenter, 171 Mich. 652, 655, 137 N. W. 538.

From all of these considerations, it follows that the decree of District Court was right. It will therefore be affirmed, at appellant's costs.